Good morning, Your Honor. I'm Stephen Sugarman, representing Appellant Conservation Congress this morning. I'm going to attempt to reserve four minutes for rebuttal. During my argument this morning I might use a few acronyms. Northern Spotted Owl will be referred to as NSO throughout, the excerpts of record will be referred to as ER, and the supplemental excerpts of record will be referred to as SER. I want to first address a critical fact that has ramifications in this case under both the Endangered Species Act and the National Environmental Policy Act, and that is the colonization of the Smoky Project area by the barred owl. The Forest Service has acknowledged that barred owls are becoming increasingly abundant in the breeding territories in the project area. The Fish and Wildlife Service has identified barred owl colonization as the most significant short-term threat to NSO conservation and recovery. Barred owl colonization leads to significant displacement of northern spotted owls as they abandon their historic nest sites and seek to establish new breeding sites in suboptimal habitat. The Fish and Wildlife Service raised this very important issue with the Forest Service early during the planning process for the Smoky Project. And when it explained why it would not agree with the Forest Service's initial determination that the project would not have an adverse effect on spotted owls or habitat within the project area, but is instead associated with significant impacts to the owl and to its habitat, the Fish and Wildlife Service noted that the barred owls had begun to colonize the project area and that this was likely to lead to NSO displacement, just as I've described. Didn't the Fish and Wildlife Service ultimately issue a biological opinion that said that the project wouldn't have deleterious impacts on the spotted owl? No, Your Honor. What the biological opinion does, and that's a different, that is under the ESA, not through the NEPA, what the Fish and Wildlife Service did in its biological opinion is it found that the project would not lead to, would not jeopardize the continued existence of the northern spotted owl. Importantly, in the 2015 biological opinion, which is the operative biological opinion in this case, as the Court knows, there was a series of clearly reflects that the Forest, Fish and Wildlife Service expected, because the Forest Service had made a commitment during the consultation process that continuous surveys would be conducted for spotted owls as the project was implemented. These are known as protocol-level surveys, which are specifically designed to detect spotted owls, even in the presence of barred owls. The second study, Your Honor, was based on the 2015 biological assessment that had been earlier provided by the Forest Service. And in that 2015 biological assessment, the Forest Service had specifically indicated that one of its limited, one of the mitigation measures that would be applied to the sale would be implementation of a limited operating period, or LOP, that had been developed in the NEPA process for the sale back in 2011 and 2012. And there are a couple of places in the record where the Forest Service indicated to the Fish and Wildlife Service in the 2015 BA that those surveys would be conducted. That was, that would be at SCR 990 and at SCR 994 and 995. The commitment was particularly important because the limited operating periods in this case were specifically designed not to be static and to be based on the historic locations of owls within the project area. Rather, the LOPs, and they appear at ER 129 in the EA, states that a limited operating period for NSOs will be applied to all units from February 1st to September 15th, unless current protocol level... You said, didn't Judge Mendez determine that that was simply an error? Judge Mendez did find that that was an error. As you know, my client takes exception to that finding. We believe that it's clearly erroneous. The Forest Service had earlier explained why it had, in district court proceedings, had explained why it had adopted that specific LOP, which was to provide and to overlay an additional layer of protection that had been requested by the Fish and Wildlife Service. But, Judge Seaborg, even if that was an error, the fact that the LOP was erroneously stated, if you believe that to be the case, has legal consequences. First of all, under the ESA, an action agency like the Forest Service is obligated to implement the action that it says that it is going to implement. And in this case, the biological assessment, just as I've indicated to you, specifically restated the LOP that would be adopted during the...that was adopted during the environmental assessment. In other words, the Forest Service had told the Fish and Wildlife Service, in the specific context of the 2015 consultation, that they would comply with that LOP. Could you help me with...I'm having some trouble just understanding exactly what your dispute is with the determination that Judge Mendez made at the end of the line that his injunction he was going to lift and he was...saw no violation, NEPA violation or ESA violation. Is your principal argument that he should have considered the federal funding alternative for timber removal? That's one. And then the second being that the limited operating period should have been expanded beyond the particular scope that was in the project that ultimately was blessed. Are those your...is that your two basic arguments? Well, we have a number...I would say our central core claims are that the repudiation of the LOP that was stated first in the environmental assessment and then by the Forest Service in the 2015 biological assessment has serious consequences under ESA and NEPA. We also allege that the Forest Service conducted an inadequate alternatives analysis. We also allege that the cumulative impacts analysis was inadequate. And finally, we allege that the Forest Service's decision not to prepare an EIS in this case was not based on a convincing statement of reasons and that an EIS should have been prepared because of the potential of significant impacts. But again, just to conclude on this first argument that we were talking about, which is the serious deviation from the LOP that had been stated repeatedly by the Forest Service, both in the original NEPA documentation and then in the 2015 biological assessment. And the 2015 biological opinion was keyed off of the commitments that the Forest Service had made in that 2015 BA. Even if you believe that the Forest Service had simply made a mistake in stating that LOP, which Judge Mendes did, that's not the end of the inquiry. Judge Mendes said in his final opinion in this case, well, I've asked the Forest Service to explain what was going on here. I do believe, he had said, that the LOPs are the heart of the project in his merits order. And he said, and the Forest Service gave an explanation. They said it was a mistake, so that's the end of the matter. But it's not the end of the matter, because if you go to the 2015 consultation, which was the Endangered Species Act compliance process, again, the Forest Service was still saying that it would implement these survey-based LOPs, which are crucially important because of the very fluid situation with respect to spotted owl locations in the area. And again, in that biological opinion, in 2015, the Fish and Wildlife Service said, we have been told by the Forest Service that ongoing surveys will be conducted in the project area. That's at SER 939. And the Forest Service also – and the Fish and Wildlife Service issued its biological opinion on that basis. So it's a fundamental of ESA law in this circuit that an action agency can't say one thing and do another thing and thereby achieve a non-Jeopardy opinion. And that's just what happened in this case, Your Honors. In the 2015 biological assessment, which is the operative biological assessment in this case, the forest said, we're going to implement those LOPs just as we set them out in the 2012 EA. And the reason that they were set out that way was to account for this very fluid situation of barred owl – barred owl colonization in the area. So – and we will make sure that owls, wherever they are located in the area, will be protected by that – those ongoing surveys. The Forest Service said in the 2015 BA, regardless of where NSOs are located, the limiting operating periods will – which will be in place unless – will be in place unless protocol-level surveys indicate they are unnecessary. That's at SER 994 and 995. Importantly, just before I sit down here, I want to say that this barred owl issue, which, again, has been noted by the Fish and Wildlife Service to be the single most important issue affecting the short-term conservation and recovery, was not even mentioned by the Forest Service anywhere in its NEPA documentation for the project. You can look at the environmental assessment and the decision notice in FONSI for the project, and there is not even a single passing reference, let alone an analysis of the impact of barred owl colonization in the Smoky Project area. – Let me ask you on the federal funding point. Is federal funding an alternative? I mean, we don't – we have no idea whether or not federal funding would be available or provided or – how is that even something that rises to the level of being an alternative that should be considered? – Well, the way the court needs to address that issue is like this, Your Honor. The Healthy Forest Restoration Act, which provides the exception to the general NEPA analysis requirement that the Forest Service relies on here, specifically states – it's 1665.12 subsection F – that in implementing an authorized forest restoration project that the Forest Service has a statutory obligation to maximize the retention of large trees. There's an important table that I didn't cite to in my brief at ER 246, and what this table shows is that about 15 percent of the trees that are going to be cut in the project area are larger than 24 inches. Now, in the remand analysis that the Forest Service did on the alternatives issue, what the agency did was it selected 18, 20, and 24-inch caps. We don't know why they selected those alternatives, but those were the alternatives that were selected by the Forest Service. It found, on the basis of its analysis, that the imposition of those particular caps would not allow it to meet its HFRA objective. And so it stayed pat on its earlier determination that it would – – I'm not sure how this relates to the federal funding question. – The – well, the federal funding question is, at some – at some point, there is going to be an alternative that will both allow the Forest Service to achieve its statutory objective and to meet its statutory obligation to maximize large tree retention. At SCR 68, Your Honor, the Forest Service provides some very telling statistics. What it tells us is that a 5,952 ccf – that's a measure of timber volume – sale had been – would be sufficient to pass an economic viability threshold. That was a number that was given by industry. Yet the Forest Service, in this case, provided a timber sale that would authorize 13,365 ccf, which is 225% of the minimum viable amount. That increment from 5,952 to 13,365 provides a windfall to the timber sale operator. And that windfall was specifically planned and authorized by the Forest Service to induce the timber sale operator to perform restoration work that the Forest Service says is required, but that it simply doesn't want to fund by itself. Or, alternatively, that it says that it doesn't have the funds to fund by itself. I'm very sympathetic to that argument in a general sense, and I read carefully Judge Noonan's writings on that point. I wish the Forest Service were funded in a different way, but I'm not sure we're in a position to do anything about it. The only thing that – you are in a position to do something about it, respectfully, Your Honor, and the way that you can get about that is by refusing to endorse a procedure whereby the Forest Service authorizes timber sales that are unnaturally and unnecessarily large and intensive in large trees so that they can induce a timber sale operator to conduct ostensibly needed restoration activities without the Forest Service having to dip into its own purse. Here, the Mendocino National Forest, it's conducting activities at campgrounds, it's conducting road projects, it's conducting projects at its ranger station. It could reprogram its funds if it learns from this Court that it is not permissible for the Forest Service to essentially fundraise for forest restoration activities that are in a specific way that's intended to fund restoration work that is inconsistent with the HIFRA statutory objective for tree retention. I understand the point. Listen, we've taken you over. You sought to reserve some time. I did. Let's hear from the other side.  And we'll give you a chance to respond. Good morning, and may it please the Court. Avi Kupfer for the Federal Appellees. With me at Council's table is Lawson Fite, who represents the intervener. And we'll be taking four minutes to argue, and I'll watch the clock. I'm sorry, you'll do four minutes or he'll do four minutes? Lawson's doing four minutes. I'm going to take 11, and I'll pay attention to the clock. I'd just like to begin by just taking a step back and just discussing what the primary purpose of projects like Smoky is. And that's to promote the growth of large overstory trees in these stands and to return these sorts of areas to their conditions before the ineffective policy of human forest suppression of even beneficial wildfires. And in so doing, what this sort of management does is reduce the risk and severity of the northern California last summer, and it also improves spotted owl habitat. Over about 10 years, the Forest Service and the Fish and Wildlife Service conducted a thorough review of what the environmental impacts of the Smoky project would be. And that's documented in a lengthy environmental assessment supported by a half dozen resource reports by Forest Service specialists, additional internal revisions to that analysis to account for new information discovered during the course of the study of the project, three formal consultations between those two agencies, and multiple opportunities for public input, comment, and meetings. And this was also a case that was remanded to the Forest Service for additional analysis of NEPA alternatives. And at the end of that process, Judge Mendez found that the Forest Service had adequately examined those six alternatives and found that none would meet that primary goal of this project. There was also opportunities for public participation during that process. And Judge Mendez found that this project was perfectly consistent with the controlling management documents for Mendocino National Forest, the Land Resource Management Plan, the Northwest Forest Plan, and the Spotted Owl Recovery Plan. I'd like to focus on four points. When it went back to Judge Mendez, you didn't change anything. You just provided further explanation than he assessed it and said, well, now with this additional information, I'm satisfied? Is that how it shook out? Not quite, Your Honor. There was additional explanation provided with how the limited operating periods worked in the project. But they also conducted completely new analysis, more akin to the sort of robust alternatives analysis done in a full environmental impact statement. But nothing changed? The project itself, the terms of the project didn't change. But to begin with that alternatives analysis point, below, plaintiffs asked the court to require the Forest Service to analyze diameter cap alternatives. Forest analyzed six. They ran those alternatives through their forest vegetation simulator module that accounts for local conditions, local fire patterns. And plaintiffs don't challenge that analysis. They don't challenge the data, the methodology, the forest vegetation simulator at all. And they present this new alternative, a federal funding alternative. And to your point, Judge Seaborg, that actually isn't a new alternative. There's no sort of different environmental impact that would be analyzed through that alternative. It's just simply asking that the dollars that pay for this project come entirely through the federal budget. What it's doing is it's suggesting that the size of the project is strongly influenced by a factor that shouldn't be influencing, and that is the source of the money. I mean, that's the argument that Judge Noonan made. That's the argument that's being made here. And with respect, Your Honor, that's just belied by the record here. They ran each of those alternatives through the forest vegetation simulator model. And Appendix 1 to the Supplemental Assessment, particularly pages 73 through 75 of the Supplemental Excerpts, explains exactly why none of those alternatives will achieve both the canopy coverage amount and the basal area mortality amount, unlike the preferred alternative in this project. And this is explained in the Supplemental Excerpts, but that's because there's an uneven distribution by size class of tree type. So if you're only cutting the small trees in this area and you're trying to achieve a 25 percent basal area mortality rate, you're going to reduce the canopy cover to such an extent that it will no longer be viable foraging habitat for spotted owl. But by doing the more targeted selection that the Forest Service is doing here, they can actually maintain viable spotted owl habitat throughout the entire project area while also achieving the basal area mortality goals. Unlike those alternatives. To the extent that, so in the reply brief, the plaintiffs state that their federal funding alternative is one and the same with the diameter cap alternative. And they don't challenge the diameter cap alternative. They don't challenge any of that analysis. But Judge Mendez found, and the government argues in the alternative on appeal, that this is actually a new proposed alternative that appears nowhere in the complaint, nowhere in the summary judgment briefing. At no point was this presented to the agency. As I understand your opponent's argument, it is that allowance of this project will, if I can use the word uniquely, create an environment that will attract barred owls. And let me finish. And if that's true, and barred owls come in, that displaces the northern spotted owl habitat. What's your response? Well, they're wrong on the ecology. By promoting the growth of old overstory trees, the most decadent trees in the forest, and also selecting understory perch trees, what the Forest Service is doing is creating, in the long run, much better habitat for the northern spotted owl. It's going to help this area advance from foraging habitat to nesting habitat in the spring up even more area. So it reduces the competition between those species. But a few other points with respect to barred owls. First, that isn't connected to any of the legal claims that they make. We make this point at page 10, note 2 of our brief. Second, when they say that it is identified in the recovery plan as, quote, the most important recovery issue, that's incorrect. I believe they're citing page 182 of the excerpts of record where the recovery plan says that among the most important issues for the spotted owl is barred owl competition and stand-replacing wildfires. So it identifies both on an even playing field. And finally, the recovery plan says that the Forest Service needs to manage this area for multiple goals. And it says that active forest management, like these thinning projects in dry California forests, is necessary for the long-term viability of spotted owl habitat. Because at the end of the day, it doesn't matter how much competition with barred owls there is if there are the types of stand-replacing wildfires that have been recently seen in this area. And this project, as demonstrated in Appendix 1 of the Supplement to the Environmental Assessment, is reducing basal area mortality in this area from 96% to, I believe, 22%. And none of the alternatives that don't include – that would not have included a commercial element are able to do that, again, because of the uneven distribution by basal area. I'd like to clear up another point that was made in the reply brief about retaining the oldest trees and how this project doesn't do that. That is – and I don't say this lightly – completely contradicted by the record in this case. The Forest Service is very clear that the primary goal of this project is to improve spotted owl habitat, reduce wildfire risk. And they do that by retaining and improving growing conditions for the oldest, largest trees by reducing competition with smaller trees for nutrients, sunlight, and water. And the record also says exactly how the Forest Service is going to do that. The contractor doesn't make any selections of which trees to retain and which trees to remove. Those selections are made, as required by statute, pursuant to the Smoky Silviculture Prescription and Marking Guides, which is – the operative pages are at pages 283 through 289 of the supplemental excerpts. And those guidelines for how the trees are marked and selected is very clear that the highest priority – that's a quotation of this project – is to protect the overstory that – that's on pages 284 and 285 – that there will be no removal of dominant trees in the late successional reserve. That's at page 288. And the focus is going to be on clumps of conifers that are at high risk or that are suppressed, as defined by a list of phenotypic characteristics that the ecologists for the Forest Service set out. So there's a very thorough process for actually selecting which trees are going to be removed. And furthermore, in the commercial units, which represents only about 14.5 percent of the project area here, the Forest Service is even clearer on page about 280 – I think it's 283 through 284 of the supplemental excerpts – which say that the point of commercial thinning is to retain the large overstory trees, to retain sufficient – to sufficient mid-canopy trees for purchase for spotted owls, to restore the overcrowded stands by reducing competition for those trees that are so essential for returning this area to its conditions before this failed policy during the early and mid-20th century of suppressing beneficial wildfires. With my remaining time, I'd like to just briefly address on the re-initiation of consultation point, and I just have a few quick points to make. The first is that the Fish and Wildlife Service has previously considered the correct limited operating periods as stated in the biological assessment, the 2012 biological – 2011 biological assessment and the 2012 incidental take statement of the biological opinion. They did that three times. The biological opinion, the first one at 774 to 775 of the supplemental excerpts, then again in 2014 at page 803 of the supplemental excerpts, and then finally at 932 of the supplemental excerpts, the 2015 biological opinion. I'm not sure where plaintiffs were pointing to, but page 932 of the supplemental excerpts is very clear that it's analyzing the operative biological opinions in the 2011 BA and the So a re-initiation of consultation here would be – pardon my language – pointless because they've analyzed the correct limited operating periods three times. All the 2016 letter did was apply those correct terms in a given year based on the most recent protocol-level surveys, and those are done every year. I'd just like to make one very brief point. You're ending your friend's time. You're going to have to deal with him. I'll deal with him. We'll take it out back. Just very, very briefly, this ESA point, and we mentioned this in our brief, is procedurally barred because it was never raised in the complaint or any of the summary judgment briefing or even the briefing on the dissolution of the limited injunction. Thank you very much. Thank you. I'm going to save your – Macon, would you put four minutes on the clock, please? Thank you, Your Honor. I much appreciate it. Good morning, and may it please the Court, Lawson Fyde on behalf of the intervener, Trinity River Lumber Company. I'm joined in the courtroom today by Brian Taylor, Trinity River Lumber Company's forester based in Weaverville. Now, Trinity River is not just an economic mainstay in Weaverville and rural Trinity County. It is part of the effort to recover the Northern Spotted Owl. And why do I say that? Recovery Action 16 in the revised recovery plan refers to the need to maintain infrastructure for active management due to the risk of catastrophic and stand-replacing fire, particularly in the California provinces under the Northwest Forest Plan. The Court may be familiar with how the Northwest Forest Plan divides the area into provinces. And this is a particularly fire-prone area, particularly in need of active management. The recovery plan, the Northwest Forest Plan, and the Healthy Forest Restoration Act all speak in terms of balance, balance between short-term actions and long-term effects. And this project strikes that balance. What does this project do? It has less than, it has about 900 acres of commercial treatment. None of that is in nesting or roosting owl habitat. Those treatments, coupled with the remaining treatments, are designed to accelerate the development of late successional characteristics. This is not currently an old growth area or late successional area. This is an area that needs some treatment to release suppressed conifers so that they'll grow and become that type of habitat that the owl prefers. This project will also reduce the fire risk throughout this area in this late successional reserve, in this part of the Mendocino. How close is this project to the fire that consumed part of Redding? It is, that was the, I believe the, that was called the Mendocino Fire. This is a little south of it, so the forest headquarters is in Willows, and you basically drive straight west from there. The project is up in there. It is a dry area. It's an area that's been identified in the LSR assessment as at a high fire risk. And the project was designed based on those parameters. The idea advanced by Conservation Congress that a federal funding alternative would change how the project would be designed. That's simply not correct. And the fire did threaten some communities south of Redding? Yes, absolutely. And then we had fires further south this past fire season, and we're really in a new fire paradigm, and that's part of what the revised recovery plan from 2011 recognized, that we need to do balancing and do this active management for the benefit of the species. Did I read your brief correctly that you're also advancing some jurisdictional concern that the decision, final decision by Judge Mendez on lifting the injunction is not final in some fashion? The decision to dissolve the injunction as far as it goes is certainly appealable under 1292. The question there is how the plaintiffs have structured their claims. They never filed an amended or a supplemental complaint to challenge the supplemental environmental assessment that was prepared after the remand. And so that limits the scope of the court's review based on the court's precedent interpreting section 1291 is our view of the procedural posture of this. See, I'm running very low on time. I just wanted to make one final point on how the project is structured and funded. Congress has spoken by enacting these types of stewardship contracts in legislation over the past now 30 years, and it permanently enacted in the 2014 Farm Bill. So Congress has given that direction. As the court recognized, Congress is in charge of the purse under our system. I think we understand the argument. Yeah. Thank you. Thank you. Would you put two minutes on the clock, please? A couple of points on the merits, Your Honor, and then a couple of housekeeping issues. To cut through some confusion, there are two sets of LOPs in this case. There are the LOPs that were imposed by the Fish and Wildlife Service as a condition of the no jeopardy biological opinion. Those were incorporated into the incidental take statements. Then there are the LOPs that the Forest Service itself developed to provide an additional layer of protection to the spotted owl above and beyond that which was required by the Fish and Wildlife Service. And that was explained by the Forest Service and district court proceedings. What we see here is, and then even in the 2015 B.A., the Forest Service was saying to the Fish and Wildlife Service, we are going to go above and beyond what you require. We are going to implement our own LOPs, which are far more protective and which are survey based. And it was on the basis of that commitment from the Forest Service that the Fish and Importantly here, the Forest Service has never gone to the Fish and Wildlife Service, Your Honors, to let the Fish and Wildlife Service know that they made a mistake. That hasn't happened. So the Forest Service is going to be implementing a project that the Fish and Wildlife Service doesn't know is going to be happening as a result of the 2016 letter, which will govern the sale for its life, not only for this particular year. I'm going to go right now to the housekeeping measure. I asked my counsel, my colleagues, when operations might be expected to begin in this particular year so that I could avoid the necessity of having to file any motion for interim injunctive relief in this case. And all that they're able to tell me, they've made their inquiries, and what they're able to tell me is that operations will begin as soon as ground conditions permit. Apparently, there's snow in the area right now. I've asked if they would be able to provide me with some notice – advance notice of when operations would commence – 30 days, say – so that I could avoid the necessity of a really quick motion for interim injunctive relief. They said at least as things stand right now, they're not able to provide those assurances. So we are hopeful, of course, that we would get some indication of what the merits ruling would be by the time that operations commence. Sooner's better. Yep. Got it. Okay. Thank both sides for their arguments. Thank you, Your Honor. Conservation Congress versus U.S. Forest Service now submitted.
judges: Hawkins, W. Fletcher, Seeborg